Denis Stearns, State Bar No. 1020675
William D. Marler, WSBA #17233
bmarler@marlerclark.com
MARLER CLARK, LLP PS
701 First Avenue, Suite 6600
Seattle, WA 98104
Tel. (206) 346-1888
Fax (206) 346-1898
Attorneys for Plaintiff

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

'09 AUG 20 A10 :41

JON W. SANFILIPPO
CLERK

09-C-0806

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| J.R., a minor child, and Z.R., a minor child, and their parents GERARD ROSPLOCH and NICOLE ROSPLOCH,<br><br>Plaintiffs,<br><br>v.<br><br>JBS USA, LLC d/b/a "JBS Swift & Company," a foreign corporation,<br><br>Defendant. | NO.<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

COME NOW the plaintiffs, J.R. and Z.R., minor children, and their parents GERARD and NICOLE ROSPLOCH, by and through their attorneys of record, the MARLER CLARK law firm, and alleges as follows:

## I. PARTIES

1.1 The plaintiffs are residents of Brookfield, Wisconsin. The plaintiffs reside within the jurisdiction of this Court, and are thus citizens of the State of Wisconsin.

1.2 The defendant, JBS USA, LLC, d/b/a "JBS Swift & Company" (hereinafter "JBS Swift") is a foreign corporation organized and existing under the laws of the state of Delaware,

with its principal place of business in Greeley, Colorado. The defendant is not a citizen of the State of Wisconsin.

1.3   At all times relevant hereto, JBS Swift was a manufacturer and seller of various beef products sold throughout the United States, including in the State of Wisconsin.

## II. JURISDICTION AND VENUE

2.1   This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the defendant has certain minimum contacts with the State of Wisconsin such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

2.2   Venue in the United States District Court for the Eastern District of Wisconsin is proper pursuant to 28 USC § 1391(a)(2) because a substantial part of the events or omissions giving rise to the plaintiffs' claims and causes of action occurred in this judicial district. Additionally, the defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III. GENERAL ALLEGATIONS

### JBS Swift *E. coli* O157:H7 Outbreak

3.1   On June 24, 2009, the defendant announced a voluntary product recall after it was notified by the Food Safety and Inspection Service (FSIS) and the Centers for Disease Control (CDC) of a possible link between reported illnesses caused by *E. coli* O157:H7 and the consumption of defendant's beef products.

3.2   At least twenty-three people in nine states have been infected by a genetically indistinguishable strain of *E. coli* O157:H7 linked to the defendant's beef products. At least

twelve people have have been hospitalized as a result of their infections, and at least two developed hemolytic uremic syndrome (HUS), including the minor plaintiff J.R.

### Plaintiffs' Injuries

3.3  Gerard and Nicole Rosploch purchased the ground beef that caused their sons' *E. coli* O157:H7 infections, described below, at one of two Wisconsin Pick N Save locations: at 15170 West Greenfield Avenue in Brookfield, or at 11111 West Greenfield Avenue in West Allis. Gerard, J.R., and Z.R. consumed hamburgers made from the contaminated ground beef on or about Sunday, July 19, 2009. Nicole is a vegetarian, and as a result, she did not eat a hamburger.

3.4  Gerard Rosploch, J.R., and Z.R. all began to suffer from abdominal cramps and mild nausea on or about Thursday, July 23, 2009. Nicole administered Tums to her sons, but the tablets did little to alleviate the discomfort.

3.5  The following morning, Friday, July 24, 2009, J.R. began to vomit. He continued to vomit over the course of the day, and by the early evening, the episodes of vomiting were occurring approximately every 45 minutes. He began to suffer from frequent bouts of diarrhea on Friday evening as well.

3.6  J.R.'s symptoms continued unabated into Saturday morning, prompting Nicole Rosploch to call J.R.'s pediatrician on Saturday afternoon. The pediatrician inquired whether J.R.'s bouts of diarrhea had been bloody, and Nicole reported that they were. The pediatrician advised Nicole to get J.R. to the emergency room at Children's Hospital in Wauwatosa, Wisconsin immediately.

3.7  At the emergency department, J.R. continued to be extremely ill. His vital signs were checked, and he was found to have lost approximately seven pounds since the onset of his

illness two days earlier. J.R. submitted a stool sample and was ultimately discharged with the diagnosis of a "stomach bug."

3.8 Meanwhile, Z.R. was becoming increasingly lethargic and ill-appearing. He began to vomit on Saturday evening, July 25, 2009. Gerard's illness continued as well, though it was not as severe as his sons'. Z.R. continued to suffer from severe, frequent bouts of diarrhea as well.

3.9 Nicole Rosploch took J.R. to see his pediatrician on Monday, July 27, 2009. Due to J.R.'s severely dehydrated condition, the pediatrician again advised Nicole to take J.R. to Children's Hospital.

3.10 Soon after arriving back at the emergency room at Children's Hospital in Wauwatosa, Nicole learned that J.R.'s stool sample had tested positive for *E. coli* O157:H7. Blood tests showed deficiencies in J.R.'s sodium and potassium levels, and he was admitted for treatment.

3.11 J.R. continued to be extremely ill over the next 24 hours. Tuesday evening, July 28, 2009, blood tests showed that J.R. had developed hemolytic uremic syndrome (HUS). He was immediately taken to the pediatric intensive care unit.

3.12 Back at home, Gerard Rosploch's illness had resolved, but Z.R. continued to suffer from vomiting and diarrhea. Gerard stayed home to care for Z.R., while Nicole spent most of her time at the hospital with J.R.

3.13 On or about Thursday, July 30, 2009, J.R. had surgery for the placement of a dialysis catheter. Peritoneal dialysis treatments began the next day. The dialysis treatments would continue through August 9, 2009.

3.14 On or about Monday, August 3, 2009, on the advice of J.R.'s nephrologist, Gerard Rosploch brought Z.R. to Children's Hospital to have blood tests done. Fortunately, the test results showed that Z.R. had not developed HUS.

3.15 J.R. was ultimately discharged from Children's Hospital on Saturday, August 15, 2009. In addition to the dialysis, J.R. received three blood transfusions to combat the severe anemia that he experienced during his illness. J.R. was discharged on Amlodopine, a high blood-pressure medication, which he continues to take. J.R. continues to regain significant weight lost during his illness and hospitalization.

3.16 The stool sample that J.R. submitted during his visit to the Children's Hospital emergency department on Saturday, July 25, 2009, ultimately tested positive for *E. coli* O157:H7. Further testing showed that the strain of *E. coli* O157:H7 that had infected J.R. was indistinguishable from the JBS outbreak strain.

3.17 The plaintiffs have suffered severe and permanent injury as a result of J.R. and Z.R.'s *E. coli* O157:H7 infections, and J.R.'s resulting HUS illness. As a result, the plaintiffs have incurred and will continue to incur medical expenses, have suffered and will continue to suffer pain, loss of enjoyment of life, emotional distress, and medical problems in the future as a direct and proximate result of their consumption of contaminated JBS Swift beef products.

## IV. CAUSE OF ACTION: STRICT LIABILITY

### Strict Liability—Count I

4.1 At all times relevant hereto, the defendant was a manufacturer and seller of the adulterated food product that is the subject of the action.

4.2     The adulterated food product that the defendant manufactured, distributed, and/or sold was, at the time it left the defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli* O157:H7, a deadly pathogen.

4.3     The adulterated food product that the defendant manufactured, distributed, and/or sold was delivered to the plaintiffs without any change in its defective condition.

4.4     The adulterated food product that the defendant manufactured, distributed, and/or sold was used in the manner expected and intended, and was consumed by plaintiffs Gerard Rosploch and his sons J.R. and Z.R.

4.5     Plaintiffs suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the defendant manufactured, distributed, and/or sold.

### Negligence—Count II

4.6     For purposes of this cause of action, the plaintiffs incorporate all of the above-stated allegations as if fully set forth here.

4.7     The defendant owed to the plaintiffs a duty to use reasonable care in the manufacture, distribution, and sale of its food product, the observance of which duty would have prevented or eliminated the risk that the defendant's food products would become contaminated with *E. coli* O157:H7 or any other dangerous pathogen. The defendant breached this duty.

4.8     The defendant had a duty to comply with all statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of its food product, but failed to do so, and was therefore negligent. The plaintiffs are among the class of persons intended to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the manufacture, distribution, storage, and sale of similar food products.

4.9     The defendant had a duty to properly supervise, train, and monitor its employees, and to ensure its employees' compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products, but the defendant failed to do so and was therefore negligent.

4.10    The defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, and regulations, and that were clean, free from adulteration, and safe for human consumption, but the defendant failed to do so and was therefore negligent.

4.11    As a direct and proximate result of the defendant's acts and omissions of negligence, the plaintiffs sustained injuries and damages in an amount to be determined at trial.

## V.     DAMAGES

5.1     For purposes of pleading damages here, the plaintiffs incorporate all of the above-stated allegations as if fully set forth here.

5.2     The plaintiffs have suffered general, special, incidental, and consequential damages as a direct and proximate result of the defendants' acts and omissions, in an amount that shall be fully proven at the time of trial. Such damages include, but are not limited to, the following: damages for pain and suffering; damages for the loss of enjoyment of life, past and future; medical and medical-related expenses, past and future; lost wages, past and future; loss of future earning capacity; emotional distress, past and future; and other damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray for judgment against the defendant as follows:

A. Ordering compensation for all general, special, incidental, and consequential damages suffered by the plaintiffs as a result of the defendant's conduct;

B. Awarding plaintiffs their reasonable attorneys fees and costs, to the fullest extent allowed by law; and

C. Granting all such additional or further relief as this Court deems just and equitable under the circumstances.

DATED: August 19, 2009.

ON BEHALF OF THE PLAINTIFFS:

*[signature]*

Denis W. Stearns, State Bar No. 1020675
MARLER CLARK, LLP, PS
6600 Columbia Center
701 5th Avenue
Seattle, WA 98104